UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WAYNE FALCIGLIA,

                              Plaintiff,

                                                          9:07-CV-0838
v.                                                        (DNH/GHL)

DR. WHALEN, DR. SILVERBERG,
DR. THOMPSON, DARWIN LACLAIR,
LESTER WRIGHT, STEVEN VAN BUREN,
DANIEL STEWART, RICHARD ROY,
BRIAN FISCHER,

                              Defendants.
_____

APPEARANCES:                                             OF COUNSEL:

WAYNE FALCIGLIA, 05-B-2201
Plaintiff *pro se*
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582

HON. ANDREW M. CUOMO                                     JAMES J. SEAMEN, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
The Capitol
Albany, New York 12224

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Wayne

Falciglia has brought suit against three physicians at Great Meadow Correctional Facility and six

other employees of the New York State Department of Correctional Services ("DOCS").  He alleges that the physicians violated his Eighth Amendment rights by prescribing regular insulin rather than fast-acting Humalog insulin to treat his diabetes.  He alleges that the other Defendants violated his constitutional rights by failing to correct the situation.  Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 50.)  For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I.      FACTUAL AND PROCEDURAL SUMMARY

### A.      Plaintiff's Medical Care

Plaintiff is a *pro se* inmate with a lengthy history of incarceration.  He was first diagnosed with diabetes mellitus in 1991 after a significant weight loss caused him to seek medical attention.  (Pl.'s Dep., Dkt. No. 50-3 32:6-10, Aug. 19, 2008.)  Plaintiff estimated that at the time he "probably" received regular and NPH insulin injections to treat the diabetes.  (Pl.'s Dep. 33:3-4.)

The human body uses sugar in the form of glucose as fuel to produce energy inside each cell.  Insulin functions to move glucose into the cells; if insulin is either insufficient or ineffective, as with Plaintiff, the glucose remains in the bloodstream.  (Silverberg Decl., Dkt. No. 50-5 ¶ 4.)  This leads to complications, including cells being deprived of the glucose fuel and consequently the blood glucose level rises.  Due to extra glucose in the blood, the osmotic pressure in the bloodstream rises, drawing out fluid from the cells and into the bloodstream.  As a result, despite the cells already being dehydrated, the body continues to excrete fluid leading to a worsening of the dehydration.  (Silverberg Decl. ¶¶ 4, 5.)  Synthetic insulin is given to treat this

diabetic condition.  (Silverberg Decl. ¶ 6.)

Humalog insulin is synthetic insulin that is released very quickly into the bloodstream.  It is considered ultra short-acting insulin.  (Silverberg Decl. ¶ 7.)  According to Humalog's manufacturer, the patient should eat no later than 15 minutes after taking his injection. (Silverberg Decl. ¶ 14.)  Both NPH and regular insulin are released more slowly into the bloodstream.  Regular insulin is the main short-acting insulin used in corrections facilities in New York.  (Silverberg Decl. ¶ 8.)  Lantus is an ultra slow-release insulin used to provide a low level of background insulin in order to even out blood glucose fluctuations during the day. (Silverberg Decl. ¶ 10.)  Combinations of these short, medium, and long acting insulin are used to control diabetic blood sugars.  Essential to the managing of blood sugars are blood glucose tests, also known as 'fingersticks.'  (Silverberg Decl. ¶¶ 11-12.)

In 2001, Plaintiff was convicted of crimes in both state and federal courts.  Since that time, Plaintiff has transferred back and forth between federal, state, and county custody.  (Pl.'s Dep. 26:4-31:4.)

Plaintiff testified that he first received Humalog insulin in 2002 or 2003 when he was housed at Erie County Holding Facility.  (Pl.'s Dep. 44:10-16.)  According to Plaintiff,  doctors at the Erie County facility used Humalog for treatment because the regular insulin was not working.  (Pl.'s Dep. 45:2-6.) Plaintiff testified that he continuously received Humalog injections while at the County facility.   (Pl.'s Dep. 45:9-13.)  Upon leaving the county jail for federal custody sometime in 2004 or 2005, plaintiff  continued to receive Humalog while at the Northeast Ohio Correctional Center (NEOCC) and FSP Allenwood in Pennsylvania.  (Pl.'s Dep. 45:14-46:11.) Plaintiff was transferred to Elmira in July 2005.  (Pl.'s Dep. 46:12-13.)

Plaintiff testified that he received no Humalog treatments for the first 42 days of his stay at Elmira.  (Pl.'s Dep. 46:13–17.)  Instead he received regular and NPH insulin.  However, his blood sugar level remained in the 400s and 500s.[1]  (Pl.'s Dep. 47:2–8.)  Plaintiff testified that he began receiving three doses of Humalog at Elmira after entering the infirmary for feeling "sick" and suffering weight loss.  (Pl.'s Dep. 54:14–25.)  His blood sugar dropped into the normal range (120, 130, 150) after receiving Humalog.  (Pl.'s Dep. 58:3-4.)  Plaintiff asserts that when the medical staff at Elmira saw that this treatment regimen "did not work, they documented their findings and put me back on Humalog and Lantus[2]."  (Pl.'s Decl., Dkt. No. 56-3 ¶ 4.)

Plaintiff's assertion cannot be proven or disproven because Plaintiff's medical records from 2005 are missing.  Defendants have searched for the records but cannot locate them. (Seamen Reply Decl., Dkt No. 57.)  In response to Plaintiff's motion to compel the records, I ruled that "in his opposition to Defendants' motion for summary judgment Plaintiff may ask the Court to draw factual inferences favorable to him based upon the missing records."  (Dkt. No. 54 at 2.)  Plaintiff requests an inference that the records would show that a combination of regular and NPH insulin did not effectively treat his diabetes and that Defendants deliberately destroyed the documents to cover up their later failure to prescribe Humalog at Great Meadow Correctional Facility.  (Dkt. No. 56-4 at 1.)  There is no basis for Plaintiff's assertion that Defendants deliberately destroyed the records.  However, an inference that Plaintiff's records from Elmira

---

[1]	An average blood glucose level of 120-140 over time is considered by experts to be "fairly good" diabetes control.  (Silverberg Decl. ¶ 41.)

[2]	Lantus is an ultra slow release insulin that is given only once a day.  It is useful to provide a low level of background insulin in order to smooth out blood sugar fluctuations during the day.  (Silverberg Decl. ¶ 10.)

would show that regular and NPH insulin were ineffective is appropriate.  Therefore I will
assume, for the purposes of this Report-Recommendation, that Plaintiff's records from Elmira
would show that treating Plaintiff with NPH and regular insulin did not effectively control his
diabetes.[3]

In September 2005, Plaintiff was transferred from Elmira to Clinton Correctional Facility.
There he received two doses of Humalog each day, before his morning meal and his evening
meal.  Plaintiff testified that while at Clinton his blood sugar was in the normal range at breakfast
and dinner, but went up to about 400 at lunchtime.  (Pl.'s Dep. 55:21-58:9.)

In November 2005, Plaintiff was transferred back into federal custody and remained in
federal custody until March 2007.  (Pl.'s Dep. 30:4-7, 43:13-14, 58:17-59:13.)  During this
period he received Humalog and Lantus insulin.  (Pl.'s Dep. 62:4-12.)

In 2007, Plaintiff was transferred back into state custody.  He arrived at Great Meadow
Correctional Facility on March 14, 2007.  (Defs.' Ex. 2, Dkt. No. 50-4 at 64-65.)  His claims in
this lawsuit involve his medical treatment at Great Meadow.  Great Meadow had a policy against
prescribing Humalog to inmates.  (Silverberg Decl. ¶ 13.)  This policy was based on the fast-
acting nature of the drug and the physical layout of the facility.  *Id*.  According to the
manufacturer, a patient should begin eating no later than 15 minutes after taking Humalog.
(Silverberg Decl. ¶ 14.)  The physical layout of Great Meadow prevented inmates from reaching

---

[3]        The treating Defendants argue that they should not be prejudiced by the absence
of the records because "they are not personally involved in managing inmate medical records."
(Dkt. No. 57-16 at 6.)  Dr. Silverberg declared that "[i]f some records are not available that
would be a matter for the medical records staff."  (Silverberg Reply Decl., Dkt. No. 57-11 ¶ 4.)  It
would not be unreasonable for a juror to conclude that if a patient's medical records are missing,
a treating physician should direct the medical records staff to obtain them or to otherwise
investigate the matter.

the mess hall within 15 minutes of receiving injections.  (Silverberg Decl. ¶ 15.)  Sometime prior

to October 2005, physicians at Great Meadow had tried using Humalog, but some of the treated

inmates became so hypoglycemic[4] that they passed out in line waiting to get their meals.  This

caused a commotion among the other inmates waiting in line.  Security officials insisted that

such situations not reoccur.  (Silverberg Decl. ¶¶ 15, 17.)  Medical personnel "could not find a

reasonable way to deliver Humalog to the inmate and get the inmate to the mess hall in the short

time necessary to administer it safely," so the drug was removed from Great Meadow's

pharmacy.  (Silverberg Decl. ¶ 18.)

On Plaintiff's first day at Great Meadow, Defendant Whalen (who was then the facility's

Acting Medical Director) did not see Plaintiff, but wrote his initial medication orders.  (Whalen

Decl. ¶ 4.)  Defendant Whalen ordered Lantus and regular insulin for Plaintiff.  (Defs.' Ex. 2 at

3.)

On the morning of March 16, Plaintiff's fasting fingerstick showed a blood glucose level

of 160.  (Defs.' Ex. 2 at 79.)  As previously noted, an average blood glucose level of 120-140

over time is considered by experts to be "fairly good" diabetes control.  (Silverberg Decl. ¶ 41.)

In the evening Plaintiff became hypoglycemic with a blood glucose level of 29 and passed out in

his cell.  Staff brought him by stretcher to the infirmary, where he was kept overnight for

observation and released back to his cell the following morning.  (Defs.' Ex. 2 at 3.)  Plaintiff's

fasting fingerstick readings fluctuated for the next ten days.  From March 17-26 they were 258,

90, 85, 66, 54, 270, 36, 172, 55, and 35/116.  (Defs.' Ex. 2 at 79.)

---

[4]      Hypoglycemia is the term for low blood glucose levels.  The condition can lead to
coma and even death.  (Silverberg Decl. ¶ 13.)

On March 21, Plaintiff wrote the first in a steady stream of letters and grievances regarding the decision to prescribe regular insulin rather than Humalog.  (Defs.' Ex. 2 at 129, 131.)  These grievances are discussed in more detail in the next section of this Report-Recommendation.

On March 27, Defendant Silverberg reviewed Plaintiff's chart and ordered a battery of blood tests but did not see Plaintiff.  (Silverberg Decl. ¶¶ 21, 30; Defs.' Ex. 2 at 5.)  The blood tests showed a blood glucose level of 337 and a Hemoglobin A1c level of 9.2.[5]  (Defs.' Ex. 2 at 43-44.)  Plaintiff's A1c reading of 9.2 was comparable to a daily glucose reading of 132. (Silverberg Decl. ¶ 40.)

The chart of Plaintiff's fingerstick readings from March does not show any fasting fingerstick readings for March 27-March 31.  (Defs.' Ex. 2 at 79.) An April 3 letter from Defendant Silverberg to Plaintiff states that "[i]f you do not come for your morning fingersticks it will be very hard to adjust your insulin."  (Defs.' Ex. 2 at 132.)  Defendant Silverberg declares in support of the motion for summary judgment that "I would have no reason to write that if [Plaintiff] had not been skipping" the morning fingersticks. (Silverberg Decl. ¶ 23.)

Defendants have not provided the Court with a record of Plaintiff's fingerstick readings for April 2007.  Plaintiff asserts that he fully cooperated with treatment and reported twice daily for fingersticks until April 24, 2007.  (Dkt. No. 56 at 5.)  Defendants seem to implicitly

---

[5]        Hemoglobin A1c is a measure of a patient's blood glucose level over the preceding several months, a sort of long-range test of blood glucose control.  It is the second most useful reading for managing a diabetes patient's care, with fasting fingersticks being the most useful.  (Silverberg Decl. ¶ 38.)  To convert the Hemoglobin A1c reading to a reliable daily glucose reading, one adds four to the A1c result and then multiplies that sum by ten.  (Silverberg Decl. ¶ 40.)

acknowledge Plaintiff's cooperation for the period March 14-April 24, 2007.  (Dkt. No. 50-38 at 7.)

On April 5, Defendant Thompson treated Plaintiff for the first time.  (Thompson Decl., Dkt. No. 50-6 ¶ 2.)  Plaintiff had been "exhibiting poor control of his blood sugar level," so Defendant Thompson adjusted his insulin dosage, ordered regular fingersticks, and scheduled Plaintiff to return for a follow up appointment.  (Thompson Decl. ¶ 3; Defs.' Ex. 2 at 7.)  On April 16, Defendant Thompson saw Plaintiff again, increased Plaintiff's insulin dosage, and noted concern about Plaintiff's "poor control."  (Thompson Decl. ¶ 4; Defs.' Ex. 2 at 7.)  On April 23, Defendant Thompson saw Plaintiff again and increased his insulin dosage.  (Thompson Decl. ¶ 4; Defs.' Ex. 2 at 8.)

At some point, Plaintiff told Defendant Thompson that he had been given Humalog insulin in the past and asked Defendant Thompson to order it for him.  Defendant Whalen told Defendant Thompson that Humalog was not available at Great Meadow and he could not order it.  (Thompson Decl. ¶ 5.)

On April 24, Plaintiff did not report for his morning fingerstick and insulin shot.  (Defs.' Ex. 2 at 135; Silverberg Decl. ¶ 25.)  On April 25, he again failed to appear, so a member of the staff summoned Plaintiff to the medical unit.  (Defs.' Ex. 2 at 135.)  When he arrived, Plaintiff refused his morning fingerstick and insulin.  In the form memorializing his refusal of treatment, Plaintiff wrote that the combination of insulin he had been prescribed "has been tried before and didn't work so I will not take insulin that won't help.  If I cannot be given the Humalog I need here I need to be sent to a facility where I can receive it."  *Id*.  At his deposition, Plaintiff testified that he refused treatment because "the regular and the NPH had been tried before and it didn't

work at Elmira and it wasn't working there.  And I wasn't just going to go and ke[ep] on getting sticked ... with stuff that wasn't working.  They have an obligation to give me something that works."  (Pl.'s Dep. 101:22-102:3.)

Plaintiff continued to refuse his fasting fingersticks[6] and insulin until late August or early September.  (Pl.'s Dep. 85:5-14.)  During this time, Plaintiff attempted to control his own blood glucose level by eating very minimally.  Plaintiff "would eat one meal [per day], or no meals ... depending on what kind of starches and carbs were on the menu.  I would just pick and choose what I ate or sometimes I wouldn't eat at all."  (Pl.'s Dep. 102:5-16.)

On April 30, Defendant Thompson saw Plaintiff for the last time.  Plaintiff made it clear to Defendant Thompson that he would not come to the medical unit in the morning for fingersticks or insulin and that he was trying to control his blood sugar on his own by not eating. Defendant Thompson warned him that this was dangerous.  (Thompson Decl. ¶¶ 6-7.)

After his last appointment with Defendant Thompson, Plaintiff's care was transferred to Defendant Silverberg under a new procedure for assigning inmates to medical providers. (Silverberg Decl. ¶ 29.)  Plaintiff was scheduled to see Defendant Silverberg on May 11, but did not come to the appointment.  (Defs.' Ex. 2 at 9.)

Plaintiff came to a May 18 appointment with Defendant Silverberg and informed him that he would not take the regular and NPH insulin prescribed for him in the morning and would instead attempt to control his blood sugar level by not eating.  (Silverberg Decl. ¶ 30.)  Defendant Silverberg told Plaintiff that this course of action was extremely unwise.  (Silverberg Decl. ¶ 31.)

---

[6] Plaintiff continued to receive insulin shots in the afternoon and evening even after he began refusing his morning dosage.  (*See e.g.* Defs.' Ex. 2 at 80.)

When Plaintiff was still refusing his morning insulin a week later, Defendant Silverberg discontinued the morning medication.  (Silverberg Decl. ¶ 32.)

From May 25 to June 2, Plaintiff's noon and evening fingersticks showed blood glucose levels ranging from 188-444, with an average reading slightly above 300.  (Defs.' Ex. 2 at 80-81; Silverberg Decl. ¶ 34.)  On June 2, Plaintiff was brought to the medical unit unresponsive with a blood glucose level of 24.  (Defs.' Ex. 2 at 12.)  On June 5, Plaintiff felt "shaky" and had a blood sugar level of 76.  (Defs.' Ex. 2 at 13.)

On July 6, Plaintiff had an appointment with Defendant Silverberg.  Plaintiff had lost seven pounds since his May 18 appointment.  (Silverberg Decl. ¶ 33.)  Plaintiff told Defendant Silverberg that his blood sugars were routinely running in excess of 500 and even 600.  When Defendant Silverberg checked Plaintiff's chart, it showed that Plaintiff's readings were averaging in the low 300 range.  (Silverberg Decl. ¶ 34.)  Given that Plaintiff had been refusing his prescribed fingersticks and insulin, Defendant Silverberg was surprised that these readings were not actually higher.  (Silverberg Decl. ¶ 35.)  Defendant Silverberg urged Plaintiff to comply with the fingersticks and insulin dosage in order to minimize the risk of further illness such as heart disease, blindness, stroke, kidney failure, or death.  (Silverberg Decl. ¶ 36.)

Plaintiff continued to refuse his morning and evening insulin throughout July.  (Defs.' Ex. 2 at 83.)  He did, however, receive afternoon insulin.  *Id.*

On August 8, Plaintiff was brought into the medical unit with a blood glucose level of 29. (Defs.' Ex. 2 at 15.)  He explained to Defendant Whalen that he had taken regular insulin the evening before but that he had not eaten breakfast that morning.  (Defs.' Ex. 2 at 15-16; Whalen Decl. ¶ 6.)  Defendant Whalen told Plaintiff not to miss his scheduled meals.  (Whalen Decl. ¶ 6.)

This was the only time that Defendant Whalen actually saw Plaintiff.  (Whalen Decl. ¶ 5.)

Plaintiff responded well to treatment and was released from the infirmary that day.  (Whalen

Decl. ¶ 5.)

On August 14, Plaintiff had an appointment with Defendant Silverberg. His weight had

not changed since the previous month's appointment.  (Silverberg Decl. ¶ 42.)  At this time,

Plaintiff was still refusing to come to the medical unit more than once a day for insulin or

fingersticks and was attempting to treat himself by not eating.  Defendant Silverberg noted in

Plaintiff's record that there were "very limited options."  (Defs.' Ex. 2 at 16.)  Defendant

Silverberg lowered Plaintiff's "sliding scale of regular insulin in an effort to address his morning

hypoglycemic episodes."  (Silverberg Decl. ¶ 43.)

On August 18, Plaintiff signed another form indicating that, having been informed of the

possible consequences, he refused to take regular insulin.  (Defs.' Ex. 2 at 137.)  On August 28,

Defendant Silverberg reviewed Plaintiff's chart.  He noted that Plaintiff was still only coming to

the medical unit for "p.m." insulin and fingersticks despite knowing that this was "really useless

for managing" his diabetes.  (Defs.' Ex. 2 at 18.)  He noted that Plaintiff had not had any reported

hypoglycemic incidents since August 14.  *Id.*

On August 30, Plaintiff agreed to come to the medical unit at least three times a week for

fasting fingersticks.  (Defs.' Ex. 2 at 19.)  On August 31, Plaintiff was brought to the medical

unit semi-responsive due to low blood sugar.  He was admitted to the infirmary, where he

remained for the next two weeks.  (Defs.' Ex. 2 at 19, 75-78.)  Despite high blood sugar readings,

he refused insulin at 6 p.m. on August 31 and at midnight, 7:30 a.m., noon, and 6:00 p.m. on

September 1.  (Defs.' Ex. 2 at 75; Silverberg Decl. ¶ 45.)

On September 4, Defendant Silverberg sent Plaintiff to Albany Medical Center Hospital because he was concerned that Plaintiff might be developing diabetic ketoacidosis[7] or hyperosmotic nonketotic metabolic acidosis[8]. (Silverberg Decl. ¶¶ 46-47.) The hospital found that Plaintiff was not suffering from either condition, but that he had become dehydrated and that his glucose was at the 'critical high' level of 693. Plaintiff was released back to Great Meadow the same day with a prescription for Lantus and regular insulin. No one at the hospital ordered Humalog for Plaintiff. (Silverberg Decl. ¶ 48; Defs'. Ex. 2 at 107, 110.)

On September 5, Plaintiff's blood glucose level was 264. (Defs.' Ex. 2 at 20.) On September 8, Plaintiff's blood glucose level was 219 in the morning and 483 at noon. (Defs.' Ex. 2 at 78.) On or about September 8, while Plaintiff was still housed in the infirmary, Defendant Silverberg started giving him the long-acting Lantus insulin in the mornings instead of the evenings in an effort to stop Plaintiff's morning bouts of hypoglycemia. (Silverberg Decl. ¶ 49; Defs.' Ex. 2 at 77.)

On September 10, Plaintiff's blood glucose level was 91. (Defs.' Ex. 2 at 78.) On September 11, Plaintiff's morning blood glucose level was 545. (Defs.' Ex. 2 at 78.) Plaintiff was discharged from the infirmary in mid-September. (Silverberg Decl. ¶ 50.)

On September 25, Defendant Silverberg saw Plaintiff for the first time since Plaintiff was

---

[7]     Diabetic ketoacidosis ("DKA") is a very serious condition seen in Type 1 diabetics who become hypoglycemic and dehydrated and do not receive their necessary insulin. Without insulin, the body's cells cannot obtain glucose for fuel and burn fat instead. As it burns, fat gives off ketones. As ketones rise, the pH of the body lowers. This condition can be fatal. (Silverberg Decl. ¶ 46.)

[8]     Hyperosmotic nonketotic metabolic acidosis ("HONK") is a similar, but less serious condition, to DKA that is seen in Type 2 diabetics. While HONK can be fatal, it tends to be less severe and more easily treated than DKA. (Silverberg Decl. ¶ 47.)

discharged from the infirmary. Defendant Silverberg noted that Plaintiff had been eating regularly and had not had any low blood sugar readings.  Plaintiff told Defendant Silverberg that he planned "to be the perfect patient for the next 30 days."  (Silverberg Decl. ¶ 51; Defs.' Ex. 2 at 22.)  At his deposition, Plaintiff testified that he made this decision on the advice of a lawyer in order to "show them that it doesn't work."  (Pl.'s Dep. 85:17-86:4.)

On October 2, Plaintiff's medical records state: "Strongly suspect [inmate] is eating prior to fingersticks in order to get extremely high readings."  (Defs.' Ex. 2 at 24.)

In mid-October, Defendant Silverberg began to consider treating Plaintiff with Humalog. In an affidavit filed in support of Defendants' motion for summary judgment, he states that "I believed then, and I still believe now, that [Plaintiff's] diabetes can be managed with the types of insulin approved for use on general population inmates at Great Meadow.  However, I thought, too, that [Plaintiff] would not fully cooperate in his care unless he was getting Humalog.  I decided that if it took getting him Humalog to get him to cooperate, it might be worth a try." (Silverberg Decl. ¶ 52.)

Plaintiff's contemporaneous medical records suggest a different rationale.  They show that Defendant Silverberg "[d]iscussed case again with Dr. Whalen ... *Doubt blood sugar will improve with [increased] regular insulin.*   Will request approval of Humalog and then *resume regimen [Plaintiff] was on at previous facility*.  Will need to do this in IPC due to risk of hypoglycemia with Humalog."  (Defs.' Ex. 2 at 25, emphasis added.)

Defendant Whalen agreed to allow Defendant Silverberg to seek approval from the central pharmacy for Plaintiff to receive Humalog.  (Silverberg Decl. ¶ 53.)  In the request, Defendant Silverberg stated that "We have tried to control his diabetes with formulary meds

without success. [Plaintiff's] control was much better on Humalog."  (Dkt. No. 59 at 14.)

As Defendant Silverberg's request was being considered, the central pharmacy emphasized that they would not approve the request unless Defendant Silverberg could guarantee that Plaintiff would eat within 15 minutes of receiving his medication.  The only way Defendant Silverberg could ensure that was to house Plaintiff in the infirmary.  (Silverberg Decl. ¶ 56.)

The central pharmacy approved Defendant Silverberg's request for Humalog on October 16.  Defendant Silverberg planned to start giving it to Plaintiff on October 19.  (Silverberg Decl. ¶ 57; Defs.' Ex. 2 at 26.)  However,  Plaintiff was transferred to Green Haven Correctional Facility on October 19, before the first batch of Humalog arrived at Great Meadow.  (Silverberg Decl. ¶ 57.)   This transfer occurred seven days afer Plaintiff sought a preliminary injunction to obtain Humalog by court intervention.  (Dkt. No. 11.)  At Green Haven, Plaintiff was immediately prescribed Humalog.  (Pl.'s Dep. 121:17-22.)

Plaintiff alleges that as a result of not receiving Humalog at Great Meadow, he suffered strokes on December 23, 2007, and May 1, 2008. (Supp. Compl. ¶ 10; Pl.'s Dep. 125:12-126:3.)

### B.    Plaintiff's Grievances

Beginning a week after he arrived at Great Meadow, Plaintiff filed many grievances and wrote many letters about the decision not to prescribe him Humalog.  (*See e.g.* Defs.' Ex. 2 at 129-131; Bellamy Decl., Dkt. No. 50-31 Ex. B at 8, 18.)  Several of these grievances and complaints were either directed to or answered by named Defendants.

On April 6, Plaintiff wrote to Defendant Lester Wright, the Chief Medical Officer for DOCS.  He complained that he was not receiving Humalog and that, as a result, he had "gone 22

14

straight days with a sugar level of close to 600[9]" and was rapidly losing weight.  Plaintiff asked

Defendant Wright to investigate and perhaps expedite Plaintiff's transfer to another facility "so

that I can get the medication I need."  (Collett Decl., Dkt. No. 50-17 Ex. A at 3.)  Defendant

Wright did not personally review this letter.  Rather, under standard procedure, the grievance was

assigned to Defendant Steven Van Buren, the Regional Health Services Administrator.  (Wright

Decl., Dkt. No. 50-25 ¶¶ 10-11, 13.)

On April 23, Defendant Van Buren responded to Plaintiff's April 6 grievance.  Defendant

Van Buren stated that he had "been informed that you recently saw the facility physician on April

23, 2007, and you are receiving your prescribed medication.  It appears that your medical needs

are being met."  (Collett Decl. Ex. A at 2.)

On June 4, Plaintiff wrote to Defendant Richard Roy, the Inspector General of DOCS.

Plaintiff described himself as a "brittle diabetic whose prescribed treatment is Humalog and

Lantus insulin."  (Collett Decl., Dkt. No. 50-18 Ex. B at 3-4.)  He explained that when he entered

state custody at Elmira in 2005 he had not been prescribed Humalog, but that "[a]fter losing 23

pounds and getting very sick ... [t]hey gave me Humalog and I recovered."  *Id*.  He stated that he

had then been transferred to Clinton, where he "was receiving the proper treatment."  *Id*.  He

stated that after his transfer to Great Meadow, he "was taken off Humalog and put on the same

treatment I was given at Elmira."  *Id*.  He stated that his blood sugar was over 500 for his first 42

---

[9]     Plaintiff's claim regarding his blood glucose level is only partially substantiated
by his medical records, which show that his non-fasting blood glucose levels were often in the
mid-to-low 500s during this period.  However, his fasting levels never exceeded 270 during this
time.  (Defs.' Ex. 2 at 79.)

days at Great Meadow[10] and that he "had to refuse the medical dept. treatment and simply starve myself because nobody is doing anything about this situation." *Id*. He asked Defendant Roy to "[p]lease do something." *Id*. Staff at Defendant Roy's office, as was standard practice, forwarded the correspondence to Defendant Wright for a response without any review by Defendant Roy. (Roy Decl., Dkt. No. 50-28 ¶¶ 6-9.) Defendant Wright's office, as was standard practice, assigned the investigation to Defendant Van Buren without any review by Defendant Wright. (Wright Decl. ¶¶ 11, 13.)

On July 2, Defendant Van Buren responded to Plaintiff's June 4 letter to Defendant Roy. (Collett Decl. Ex. B at 2.) Defendant Van Buren stated: "Dr. Wright has asked me to respond to your recent letter ... I have been informed that you recently saw the facility physician on May 25, 2007, and you are on medication. It appears that your medical needs are being met." *Id*.

On July 6, an attorney with the Legal Aid Society wrote to Defendant Wright on Plaintiff's behalf. She stated that Plaintiff "tells us he is a brittle diabetic and that his glucose levels can only be controlled with Hemalog (sic) insulin." The attorney asked Defendant Wright to investigate. (Collett Decl., Dkt. No. 50-19 Ex. C at 3.)

On July 12, Plaintiff filed a grievance against Defendants Thompson and Silverberg "who have for the past 119 days refused to give me a diabetic diet, diabetic night snack, and the supplemental drinks that the other diabetics get ... First and foremost I want to know why they have refused to properly treat my high sugar by giving me these things the other diabetics get." (Bellamy Decl., Dkt. No. 50-32 Ex. C at 4.)

---

[10]     Plaintiff's claim is not supported by his medical records, which show that his non-fasting blood glucose levels were generally in the 300 range. (Defs.' Ex. 2 at 79-80.)

On July 13, Plaintiff filed a grievance against Defendant Silverberg, stating that "the only treatment he is offering me consists of the use of regular insulin to replace the Humalog that the facility refuses to give me ... [H]e insists on a treatment that is documented in my medical files not to work ... In the 42 days that I allowed myself to be treated by the doctors at this facility, I had 25 days of sugar level over 600, 11 days over 500, 5 days over 400, and 1 day at 354 ... I have been here over 90 days without my medication ... If this facility will not give me the insulin I need then they have a duty to find another treatment that works."  (Bellamy Decl., Dkt. No. 50-33 Ex. D at 4-5, emphasis in original.)

On July 26, the Division of Health Services received a letter to Defendant Wright from Plaintiff.  (Collett Decl., Dkt. No. 50-21 Ex. E at 3-4.)  He complained that the only time his blood sugar level came down into the 300 range was when he did not eat and yet "the only treatment [Defendant Silverberg] has offered me consists of the use of regular insulin which does not work on me see medical records from Elmira 2005."  *Id*.  He stated that Great Meadow's staff "is by far the worst medical dep[artmen]t in the entire state ...I will die here as I refuse to let any of the doctors here treat me for anything ... Sir, this is your last chance to do something to fix this situation as I cannot continue to go without my prescribed insulin."  *Id*.

On July 30, Plaintiff wrote to Defendant Fischer.  He asked why Defendant Fischer was "forcing me to stay in a facility where I cannot get the proper medical care."  (Collett Decl., Dkt. No. 50-20 Ex. D at 3-4.)  He threatened to sue.  *Id*.

On August 6, a letter bearing what purports to be Defendant Wright's signature was sent to the attorney from the Legal Aid Society.  It stated that Dr. Wright had "been informed that [Plaintiff] is on appropriate medication for his diabetes and is approved to see the facility

17

physician. It appears that his medical needs are being met." (Collett Decl. Ex. C at 2.) In an affidavit filed in support of Defendants' motion for summary judgment, Defendant Wright states that this letter was prepared by Defendant Van Buren and "was not signed by me." (Wright Decl. ¶ 12.)

On August 6, the Inmate Grievance Resolution Committee ("IGRC") recommended denying Plaintiff's July 12 grievance regarding diabetic snacks. The IGRC stated that the grievance should be denied "to the extent that based on the medical response, inmate is non-compliant with" treatment. (Bellamy Decl. Ex. C at 9.)

On August 6, the IGRC issued a split recommendation on Plaintiff's grievance regarding Humalog. The inmate representatives "recommended that grievant receive the Humalog that was prescribed by the Erie County Medical Center after a referral from DOCS medical department. If there is a confliction (sic) with a 'Time Log' as the investigation support suggests, then it is recommended that grievant be allowed to have his meals brought to him as some special diets ... are brought to the cells. If this medication was prescribed by a specialist through a DOC medical referral, then it is recommended that the specialist's order be given." The staff representatives recommended that the grievance be denied "to the extent per investigation Dr. Silverburg (sic) is unable to provide HUMALOG (sic)." (Bellamy Decl. Ex. D at 9.)

On August 6, a letter bearing what purports to be Defendant Wright's signature was sent to Plaintiff in response to his July 30 letter to Defendant Fischer. It stated that "[t]he Division of Health Services has investigated your concerns with the health staff at Great Meadow Correctional Facility. I have been informed that you are on the appropriate medication for your diabetes. In addition you are approved to see the facility physician. It appears that your medical

18

needs are being met." (Collett Decl. Ex. D at 2.)  In an affidavit filed in support of Defendants'

motion for summary judgment, Defendant Wright declares that Defendant Van Buren prepared

the response and that he did not personally see it or sign it.  (Wright Decl. ¶¶11, 13.)

On August 8, Plaintiff filed a grievance stating that "[t]his morning I was found

unconscious due to low sugar.  This is the 5th time since I've been here.  This happens because of

the large insulin shot I get at 4 p.m.  When Dr. Silverberg told me I could not get Humalog he

doubled my Lantus dosage which doesn't work unless I don't eat.  My insulin dosage needs to be

adjusted ." (Bellamy Decl., Dkt. No. 50-34 Ex. E at 7.)

On August 9, Plaintiff's grievance regarding the failure to prescribe Humalog was denied

at the Superintendent's level.  The written decision, which was signed by Deputy Superintendent

Richard Potter, stated that "[t]he facility doctor is unable to provide Humalog to the grievant due

to time restraints of the facility meal time.  The medication is not offered at this facility.  On

5/18/07 the grievant did refuse medical treatment."  (Bellamy Decl. Ex. D at 4.)

On August 28, Defendant Van Buren responded to Plaintiff's July 26 letter to Defendant

Wright.  He stated that he had "been informed that you recently saw the facility physician on

August 14, 2007, and you are on medication.  It appears that your medical needs are being met."

(Collett Decl. Ex. E at 2.)

On August 28, Plaintiff's mother wrote to Defendant Wright, stating that her son had

been found "in a coma ... five or six times" and that she "treat[s] [her] animal better than our so

called Correctional System."  She asked Defendant Wright to help her son.  (Collett Decl., Dkt.

No. 50-23 Ex. G at 3-4.)

On August 31, Plaintiff's July 12 grievance regarding the refusal to provide diabetic

snacks was denied at the Superintendent's level.  By this time, Defendant LaClair was no longer the superintendent of Great Meadow.  (LaClair Decl., Dkt. No. 50-8 ¶ 1.)  The written decision, which was signed by D.A. Rock, stated that "[t]he Doctor saw the grievant on 7/6/07 and 8/14/07.  The grievant has no complaint with the Doctor's treatment.  The [g]rievant should request a snack at his next appointment.  Grievant is receiving adequate care but not following the treatment orders."  (Bellamy Decl. Ex. C at 3.)

On September 12, the Central Office Review Committee ("CORC") denied Plaintiff's grievance regarding Humalog.  The written decision stated that "Humalog is not medically indicated for the grievant at this time."  (Bellamy Decl. Ex. D at 1.)

On September 12, a letter bearing what purports to be Defendant Wright's signature was sent in response to the letter from Plaintiff's mother.  It stated that no information about Plaintiff could be released without a signed authorization form but that she should "be assured that Mr. Falciglia is receiving necessary health care and services."  (Collett Decl. Ex. G at 2.)

On September 17, the IGRC "granted" Plaintiff's August 8 grievance regarding medical care "to the extent that grievant was seen by the medical department."  (Bellamy Decl. Ex. E at 5.)

On October 2, the Superintendent responded to Plaintiff's August 8 grievance regarding medical care.  The written decision, signed by D.A. Rock, stated that Plaintiff "has been seen on numerous occasions by the medical staff.  The grievant cannot receive Humalog as he wishes because it is not available at the facility.  The grievant has refused medical treatment in the past. It is advised that he has another appointment on 8/28/07 (sic) and to discuss his medication needs with his doctor.  At this time the grievant is receiving adequate medical care."  (Bellamy Decl.

Ex. E at 4.)   Plaintiff appealed this decision to the CORC, stating that "[s]ince September 5, 2007, I have been complying with Dr. W's insulin treatment.  It is still not working, which proves that I was not wrong to refuse the treatments that they offered to me."  *Id*.  The CORC upheld the Superintendent's finding.  *Id*. at 2.

On October 17, the CORC upheld the Superintendent's denial of Plaintiff's grievance regarding diabetic snacks.  The CORC stated that "the grievant receives an appropriate evening snack and is receiving appropriate medical treatment for his medical condition.  CORC notes from the facility investigation that the grievant has been non-compliant with the treatment plan.  CORC advises the grievant to follow recommended treatment plan by health services staff." (Bellamy Decl. Ex. C at 1.)

## II.    LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the

21

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine

issue of material[11] fact exists, the Court must resolve all ambiguities and draw all reasonable

inferences against the moving party.  *Major League Baseball Properties, Inc. v. Salvino*, 542

F.3d 290, 309 (2d Cir. 2008).

## III.    ANALYSIS

Defendants argue that they are entitled to summary judgment because (A) Plaintiff failed

to exhaust his administrative remedies against Defendants Whalen, LaClair, Wright, VanBuren,

Stewart, Roy, and Fischer; (B) Defendants Whalen, Thompson, and Silverberg were not

deliberately indifferent to Plaintiff's serious medical needs; and (C) Defendants LaClair, Wright,

Van Buren, Stewart, Roy, and Fischer were not personally involved in any alleged constitutional

violation.  (Defs.' Mem. of Law in Supp. of Summ. J., Dkt. No. 50-37, ("Defs.' Br.").)

### A.    Plaintiff Was Not Required to Identify Each Defendant in His Grievances in Order to Exhaust His Administrative Remedies.

Defendants argue that because Plaintiff's grievances regarding his medical care

mentioned only Defendants Thompson and Silverberg, Plaintiff failed to properly exhaust his

administrative remedies as to Defendants Whalen, LaClair, Wright, Van Buren, Stewart, Roy,

and Fischer.  (Defs.' Br. at 15-16.)  Defendants are incorrect.

The Prison Litigation Reform Act ("PLRA") requires prisoners who bring suit in federal

court to first exhaust their available administrative remedies.  *Porter v. Nussle*, 534 U.S. 516, 532

(2002).  The DOCS grievance process has three steps: first, the prisoner files the grievance with

---

[11]      A fact is "material" only if it would have some effect on the outcome of the suit.
*Anderson*, 477 U.S. at 248.

the IGRC.  If the prisoner disagrees with the IGRC's decision, he must appeal it to the

Superintendent of the facility.  If he disagrees with the Superintendent's decision, he must appeal

it to the CORC.  *Hemphill v. New York*, 380 F.3d 680, 682 (2d Cir. 2004).  If a prisoner fails to

properly follow each of the applicable steps prior to commencing litigation, he has failed to

exhaust his administrative remedies.  *Woodford v. Ngo*, 548 U.S. 81 (2006).

The PLRA does not require a prisoner's grievance to identify the parties responsible for

misconduct unless the state's rules require such identification.  *Jones v. Bock*, 549 U.S. 199, 218

(2007).  DOCS' grievance procedures do not require inmates to specifically name responsible

parties.  *Espinal v. Goord*, 558 F.3d 119, 121, 125-26 (2d Cir. 2009).  Therefore, New York state

prisoners are not required to identify each defendant by name in their grievances in order to

"properly" exhaust their administrative remedies.  *Id*. at 127.  Accordingly, I recommend that the

Court reject Defendants' argument that Plaintiff failed to properly exhaust his administrative

remedies.

> **B.    There Are Issues of Fact as to Whether the Treating Defendants Were Deliberately Indifferent to Plaintiff's Serious Medical Needs.**

> 1.    Legal Standard for Claims of Medical Deliberate Indifference

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual"

punishments.  The word "punishment" refers not only to deprivations imposed as a sanction for

criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*,

429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary

and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that

mark the progress of a maturing society."  *Estelle*, 429 U.S. at 102.  Thus, the Eighth

Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer*, 511 U.S. at 832 (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996), *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a

substantial risk of serious harm.'" *Chance*, 143 F.3d, 698, 703 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.  *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need.  *Farmer*, 511 U.S. 825, 835; *Ross v. Giambruno*, 112 F.3d 505 (2d Cir. 1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference."  *Estelle*, 429 U.S. at 105-06.  Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment."  *Id.*  Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")  However, malpractice that amounts to culpable recklessness constitutes deliberate indifference.  Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703.

      2.   <u>Analysis</u>

      Here, Defendants concede, for the purposes of the summary judgment motion, that a question of fact exists as to whether Plaintiff suffered from a serious medical need.  (Defs.' Br. at 5.)  They argue, however, that "because of [P]laintiff's lack of cooperation in his own care and

his failure to otherwise raise a question of material fact as to the subjective prong of a constitutional medical indifference claim," their motion should be granted. *Id*.

Being mindful that the Court must resolve all ambiguities and draw all reasonable inferences against the treating Defendants, and further being mindful that Plaintiff appears *pro se* and asserts violation of his constitutional rights, I find that a reasonable jury could return a verdict in Plaintiff's favor.

a. *Deliberate Indifference*

There are material issues of fact with respect to what the treating Defendants knew about the treatment that had been provided to Plaintiff prior to his arrival at Great Meadow.  It appears virtually undisputed that he was treated with Humalog as follows:

| | |
|---|---|
| 2002/2003-2004/2005: | at the Erie County Holding Center[12] |
| 2004/2005-?: | at the Northeast Ohio Correctional Center |
| ?-July 2005: | at FSP Allenwood |
| September 2005-November 2005: | at the Clinton Correctional Facility |
| November 2005-March 2007: | at the Erie County Holding Center |

It also is virtually undisputed that this extended treatment with Humalog, at a minimum of four different facilities, was successful.

With respect to Plaintiff's treatment at Elmira, that too is undisputed because, as discussed above, any medical records that might cast doubt on Plaintiff's version of events cannot be located.  In other words, a reasonable juror could conclude that the Elmira medical

---

[12] This apparently is in Erie County, Pennsylvania.  (Defs.' Statement Pursuant to Rule 7.1(a)(3) ("Defs.' Rule 7.1 Stmt."), Dkt. No. 50-36 at 1 n.2.)

records would state that Plaintiff had been treated with regular and NPH insulin for 42 days, that the treatment did not work, that these findings were documented, and that Plaintiff then was treated successfully with Humalog.[13]

The issue, however, is what did the treating Defendants know about this prior successful treatment. First, Defendants Thompson and Silverberg acknowledge that Plaintiff told them about his prior treatment with Humalog. (Silverberg Decl. ¶ 22; Thompson Decl. ¶ 5.) Defendant Whalen acknowledges that Defendant Silverberg conveyed this information to him. (Whalen Decl. ¶ 7.)

Furthermore, there is a triable issue of fact with respect to whether the treating Defendants had access to, and examined, Plaintiff's medical records. Defendants' counsel has acknowledged "that it is the usual custom and practice for an inmate's entire medical file, among others, to move with the inmate to his new housing facility." (Dkt. No. 49 ¶ 15.) Thus it would not be unreasonable for a juror to conclude that Plaintiff's medical records from the Erie County Holding Center, the Northeast Ohio Correctional Center, FSP Allenwood, and the Clinton Correctional Facility (as well as, of course, Elmira) were in the possession of the medical unit at Great Meadow and therefore available to the treating Defendants. Indeed, the Court is struck by the fact that the treating Defendants have not denied that they did have access to, and examined, these medical records. In their declarations they carefully state that they did not see any records indicating that forms of insulin other than Humalog did not work on Plaintiff. But they are silent

---

[13]     Defendants argue that Plaintiff's testimony in this regard would be inadmissible hearsay. (Defs.' Reply, Dkt. No. 57-15 at 5.) This is not necessarily the case. The testimony could be offered, not "to prove the truth of the matter asserted" (Fed. R. Evid. 801(c)), but rather to establish that the treating Defendants would have been on notice.

as to whether they saw records showing the extended successful treatment with Humalog.  Dr. Silverberg's silence in this regard is particularly intriguing, since in the medical records he refers to the "regimen [Plaintiff] was on at previous facility" (Defs.' Ex. 2 at 25) and he states that "[Plaintiff's] control was much better on Humalog."  (Dkt. No. 59 at 14.)  Did he obtain this information from Plaintiff or from the medical records?[14]

If a juror did conclude that those records were available to the treating Defendants, that juror then could reasonably find that the subjective prong of Plaintiff's claim had been met.  It is undisputed that from March 14, 2007, through April 24, 2007, while Plaintiff was for the most part cooperating with the medical unit, he had wildly fluctuating blood glucose levels and on one occasion passed out in his cell and had to be brought to the infirmary on a stretcher.  Subsequently his blood glucose levels continued to fluctuate dramatically.  On June 2 he was brought to the medical unit unresponsive with a blood glucose level of 24.  On June 5 he was "shaky" with a level of 76.  Later he spent two weeks in the infirmary and was sent to the Albany Medical Center Hospital because of a concern that he might have a condition that could be fatal.  Under these circumstances a juror could reasonably find that the treating Defendants were deliberately indifferent by subjecting Plaintiff to these conditions for an extended period of time

---

[14]    The treating Defendants implicitly argue that they relied upon a "federal prison medical summary form, prepared the very day before [P]laintiff arrived at Great Meadow, indicating that [P]laintiff's diabetes was being managed by, *inter alia*, regular insulin."  (Defs.' Reply at 5.)  This form is titled "Medical Summary of Federal Prisoner/Alien *in Transit*."  (Defs.' Ex. 2 at 64, emphasis added.)  It would not be unreasonable for a juror to conclude that while in transit a prisoner would not be treated with fast-acting Humalog, but that in terms of general treatment the document is irrelevant, and arguably should have been viewed as such by the treating Defendants.  Indeed, a reasonable juror might be disturbed by the treating Defendants reliance upon this document, when so many contrary records presumably were available to them.

when a proven successful treatment was at hand.[15]  The proof at trial, of course, might establish that Plaintiff's medical records never were at Great Meadow or, if they were, the treating Defendants never saw them.  But even in this context a juror could reasonably find that the treating Defendants were deliberately indifferent by not seeking out those records.  "[A] physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan."  *Chance*, 143 F.3d at 703.[16]

Finally, the Defendants note that "[j]ust because two physicians may opt not to treat the same illness in the same manner, does not mean one of them must *necessarily* have been acting with deliberate indifference to the patient's needs."  (Defs.' Reply at 6, emphasis added.)  This, of course, is accurate: the mere disagreement does not "necessarily" establish deliberate indifference.  However, the disagreement must be considered in context.  In *Douglas v. Stanwick*, 93 F. Supp. 2d 320 (W.D.N.Y. 2000), which Defendants cite on this issue, a hospital physician prescribed a specific pain medication for the plaintiff; the defendant prison physician directed that this particular medication be withheld and that Tylenol instead be provided.  The Court found it

---

[15]     Great Meadow, of course, did not have Humalog in its pharmacy because of the facility's policy.  However, Defendants have not addressed why Plaintiff was not simply transferred to another facility that did not have such a policy.  It appears that this was easily accomplished on October 19, 2007, a mere seven days after Plaintiff sought a preliminary injunction to obtain Humalog through court intervention.

[16]     The treating Defendants had varying degrees of involvement in Plaintiff's treatment.  Defendant Whalen, for example, was directly involved in Plaintiff's care only twice (although he also was indirectly involved in Plaintiff's care through consultations with Defendants Silverberg and Thompson).  At trial, because of this, the jury might conclude that one or more of the treating Defendants was not deliberately indifferent.  But for purposes of the pending motion, triable issues of fact exist with respect to each of them.

> noteworthy that plaintiff, on the occasions when he did see [the prison physician] at sick call, *never* complained of pain in his hand ...[B]ased on her interactions with plaintiff, [the prison physician] had no reason to believe that plaintiff was suffering from pain in his hand, or that over-the-counter medications were not adequately relieving his pain.

*Douglas,* 93 F. Supp. 2d at 326.  This contrasts starkly with the facts of the instant case, where a reasonable juror could conclude that the treating Defendants' treatment was not working and that they knew it.

On this point Defendants also cite to *Lighthall v. Vadlamudi*, No. 9:04-CV-0721, 2006 U.S. Dist. LEXIS 74737, 2006 WL 721568 (N.D.N.Y. March 17, 2006).  But there Magistrate Judge Treece explicitly found that "[a] thorough review of the record does not indicate that Dr. Vadlamudi provided a course of treatment that was different from any of those recommended by the specialists."  *Id*, at *11.  In the instant case, again, the facts are starkly different: it appears that all of the other physicians prescribed Humalog; only the treating Defendants did not.

b.     *Plaintiff's lack of cooperation*

The treating Defendants also have argued that their motion should be granted "because of [P]laintiff's lack of cooperation in his own care."  (Defs.' Br. at 5.)  However, as previously noted, Plaintiff did cooperate for the most part from March 14 through April 24, 2007, and from September 25 through October 19, 2007, and the treatment was not successful despite his cooperation.  Whether Plaintiff was required to cooperate further with a treatment program that appeared to be doomed to fail is for the jury to decide.  As stated in *Ruffin v. Deperio*, 97 F. Supp. 2d 346, 355 (W.D.N.Y. 2000): "The question of plaintiff's possible noncompliance with his [medical] regimen and the effect it may have had on the ultimate outcome in this matter

30

requires credibility determinations, a weighing of the evidence, and the drawing of legitimate

inferences from the facts.  These are functions for the jury."


c. *Plaintiff's compliance with Local Rule 7.1*

In their Reply Memorandum of Law, Defendants point out that Plaintiff failed to dispute

facts that had been set forth in their "Statement Pursuant to Rule 7.1.(a)(3)" and therefore he is

deemed to have admitted those facts.  (Defs.' Reply at 2-3.)  The problem with this argument is

that the Court's recommendation on the pending motion is based primarily upon a finding that

triable issues of fact exist with respect to what the treating Defendants knew and, based upon this

knowledge or lack of it, what they then did about his medical treatment.  The only "undisputed"

fact arguably relevant to this issue that is cited by Defendants in their Reply Memorandum is the

following: "The only record in [P]laintiff's file which identifies the diabetes medication he was

receiving prior to his arrival at Great Meadow on March 14, 2007, was a federal prisoner medical

form, dated the day before, which indicated he was receiving regular insulin and Lantus."  *Id*. at

2.  The actual statement in Defendants' Rule 7.1(a)(3) submission is very slightly, but

significantly, different:

> 33. When plaintiff first arrived at Great Meadow on March 14, 2007,
> he didn't have any papers with him (91). The only document in
> plaintiff's medical record from Great Meadow which contains any
> reference to the types of insulin he received *immediately* prior to
> transferring there is a "Medical Summary of Federal Prisoner/Alien
> in Transit" form, dated March 13, 2007 (Exh 2 at 64).

> 34. This form does not include any reference to Humalog; it shows
> plaintiff receiving Lantus and Regular insulin (Id.). It does report that
> plaintiff had been refusing fingersticks and insulin as late as the day
> before he arrived at Great Meadow (Id.).

(Defs.' Rule 7.1 Stmt. at 6, emphasis added.)  The significant difference is the word
"immediately."  By failing to dispute these statements Plaintiff is deemed to have admitted
merely that this was the only document in his medical file from Great Meadow which contained
any reference to the types of insulin he received "immediately" prior to transferring there.[17]  This
has nothing to do with the issue as to whether Great Meadow and the treating Defendants
subsequently obtained Plaintiff's medical records from the Erie County Holding Center, the
Northeast Ohio Correctional Center, FSP Allenwood, the Clinton Correctional Facility, and
Elmira.  Indeed, Dr. Silverberg's declaration suggests that this probably occurred:

> While the medical chart is supposed to arrive with the inmate,
> infrequently an inmate will arrive without any medical records.
> Occasionally, an inmate will arrive with his active medical chart, but
> not his inactive, or older, records. In both these situations, it is my
> understanding that medical records staff requests the missing records
> from the inmate's previous state facility. I assume that was done in
> this instance, but I have no first hand knowledge that it was or was
> not done.

(Silverberg Decl. ¶ 5.)  In short, the Court finds that Plaintiff's failure to comply with Local Rule
7.1 is of no significance.

### C.    The Non-Treating Defendants.

In addition to his claims against his treating physicians, Plaintiff has asserted claims
against Defendants LaClair, Wright, Van Buren, Stewart, Roy, and Fischer because they
allegedly failed to adequately respond to his complaints about the medical care he received at
Great Meadow.  These Defendants argue that they are entitled to summary judgment dismissing

---

[17]    This document also is discussed in footnote 14 above.

the claims against them because they were not personally involved in any constitutional violatons.  (Defs.' Br. at 11-14.)

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]).[18]  In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[19]  If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct.[20]  In other words, supervisory officials may not be held liable merely because they held a position of authority.[21]  Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation

---

[18]     *Accord*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

[19]     *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

[20]     *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

[21]     *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[22]

The claims against Defendants Roy, Fischer, Stewart, and LaClair are subject to dismissal

for lack of personal involvement.  The evidence before the Court shows that Defendants Roy,

Fischer, Stewart, and LaClair forwarded the complaints that Plaintiff directed to them to other

personnel for action as per standard protocol.  (Roy Decl. ¶¶ 6-9; Fischer Decl. ¶¶ 3-8; Stewart

Decl. ¶¶ 3-11; LaClair Decl. ¶¶ 3-12.)  A supervisory official "fail[s] to remedy [a] violation after

learning of it through a report or appeal" only where the evidence shows that he or she received

*and acted on* a prisoner's grievance or some other form of inmate complaint.  *Walker v. Pataro*,

No. 99-CIV-4607, 2002 U.S. Dist. LEXIS 7067, 2002 WL 664040, at *13 (S.D.N.Y. Apr. 23,

2002) (collecting cases)[23].  There is no triable issue of fact that these Defendants personally acted

on any of Plaintiff's complaints.  Therefore, I recommend dismissing the claims against

Defendants Roy, Fischer, Stewart, and LaClair.

However, it is undisputed that Defendant Van Buren received and responded to multiple

complaints from Plaintiff about his medical care.  (Van Buren Decl. ¶¶ 11-14.)  This is sufficient

to raise a triable issue of fact that he was personally involved.  While Defendant Wright asserts

that he never responded to any of Plaintiff's complaints (Wright Decl. ¶¶ 10-13), the record

---

[22]    The Supreme Court's decision in *Ashcroft v. Iqbal*, __ U.S. ___, 129 S. Ct. 1937
(2009) arguably casts in doubt the continued viability of some of the categories set forth in
*Colon*.  *See Sash v. United States*, ___ F. Supp. 2d ___, 2009 U.S. Dist. LEXIS 116580, 2009
WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009).  However, without precedential guidance from
the Second Circuit or this District, this Court is persuaded that here, where Plaintiff's claim is
based upon deliberate indifference, the *Colon* categories apply.

[23]    The Court will provide Plaintiff with a copy of this unpublished decision in
accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

contains three letters bearing Defendant Wright's signature.  (Collett Decl. Exs. C at 2, D at 2, G at 2.)  Defendant Wright's signature on those documents is sufficient to raise a triable issue of fact that he was personally involved.

### D.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  (Defs.' Br. at 16-18.)

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)).  As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) (citations omitted), *accord*, *Higazy v. Templeton*, 505 F.3d 161, 169, n.8 (2d Cir. 2007) (citations omitted).

Here, as discussed above, the facts viewed in the light most favorable to Plaintiff raise a triable issue of fact that Defendants violated his Eighth Amendment rights.

In determining whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted, courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were

unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992).

Here, inmates' Eighth Amendment right to receive adequate medical care was defined with reasonable specificity and supported by the decisional law of the Supreme Court and the Second Circuit during the relevant time period. Under that body of law and given the questions of fact discussed in part III.B.2 above, there is a question of fact as to whether Defendants Whalen, Thompson, Silverberg, Van Buren, and Wright could have reasonably understood that their acts were unlawful.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 50) be **GRANTED IN PART AND DENIED IN PART**. Plaintiff's claims against Defendants Roy, Fischer, Stewart, and LaClair should be dismissed for lack of personal involvement. In all other respects, Defendants' motion should be denied; and it is further

**ORDERED** that the Clerk serve a copy of *Walker v. Pataro,* No. 99-CIV-4607, 2002 U.S. Dist. LEXIS 7067, 2002 WL 664040, at *13 (S.D.N.Y. Apr. 23, 2002) on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

36

636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: March 22, 2010
      Syracuse, New York

                                       George H. Lowe
                                       United States Magistrate Judge